GEORGE BACHRACH vs. SECRETARY OF THE COMMONWEALTH.

Suffolk. September 11, 1980. — January 9, 1981.

Present: HENNESSEY, C.J., BRAUCHER, KAPLAN, WILKINS, & LIACOS, JJ.

*Constitutional Law,* Freedom of speech, Equal protection of laws, Elections. *Elections.*

The provisions of St. 1979, c. 745, which prohibited use of the word "Independent" as any part of a candidate's political designation on nominating petitions or on the ballot, but permitted a candidate not affiliated with a political party to adopt any other designation of his own choosing, offended against constitutional rights of expression and association and worked an invidious discrimination in violation of the constitutional guaranty of equal protection of the laws. [272-280] BRAUCHER, J., dissenting.

CIVIL ACTION commenced in the Supreme Judicial Court for the county of Suffolk on May 5, 1980.

The case was reported by *Kaplan, J.*

*Daniel A. Taylor (Charles C. Ames* with him) for the plaintiff.

*Alexander G. Gray, Jr.,* Assistant Attorney General, for the defendant.

KAPLAN, J. George Bachrach, plaintiff, a candidate in the general election of November, 1980, for the office of State senator for the Middlesex-Suffolk district, commenced the present action in the county court against the Secretary of the Commonwealth, defendant, alleging that certain ballot legislation of 1979 was invalid under the State and Federal Constitutions, and praying that, upon a declaration to that effect, the defendant Secretary be enjoined from refusing to place the term "Independent" on the ballot as the plaintiff's political designation, and from placing the term "Unenrolled" on the ballot as such designation. In due

course the plaintiff moved for summary judgment in his favor upon the pleadings and a statement of agreed facts, and the matter was then, upon joint motion, reserved and reported by the single justice, without decision, to the full bench. Argument was heard on September 11, 1980, and, as it was represented that time was short to print and distribute ballots and make other preparations for the election, the court, after consideration, entered its order on September 18 in favor of the plaintiff enjoining the defendant as prayed, with opinion or opinions to follow.

1. *The case.* We outline the record made on summary judgment, first giving the statutory background.[1] For many years before 1979, the Commonwealth recognized and made provision, in terms, for Independent candidates, and for Independent voters as well. Independent candidates were those not nominated by a "political party," as defined.[2] In seeking a place on the ballot for an office such as State senator, an Independent candidate had to obtain the signatures on his nomination papers of voters in number not less than 2% of the votes cast in that district for Governor at the previous gubernatorial election. G. L. c. 53, § 6. The nomination papers would carry the candidate's political designation, chosen by him, in not more than three words. The words could not consist of the name of a "political party," that designation being reserved for the party candidate, but otherwise any word or words could be used; the single word Independent could be used. G. L. c. 53, § 8.[3] The same rule held for the designation of an Inde-

---

[1] A good deal of statutory detail is overlooked in the brief account.

[2] By G. L. c. 50, § 1, a political party is defined as an organization whose candidate for Governor received at least 3% of the vote for that office in the previous Statewide election. (See also Rep. A.G., Pub. Doc. No. 12, at 33 [1936].)

[3] The further restriction of G. L. c. 53, § 8, was that the candidate could not use the name of any organization that had been adjudicated subversive under G. L. c. 264, § 18. Cf. *Teixeira* v. *Election Comm'rs of Boston*, 362 Mass. 526 (1972).

pendent candidate on the ballot, if he qualified to appear there. G. L. c. 54, § 41.

Statute 1979, c. 745, approved November 14, 1979, by its §§ 2 and 7 amended respectively G. L. c. 53, § 8, and G. L. c. 54, § 41, above cited, to impose the following important further restrictions: the word Independent was forbidden as any part of the designation on nominating petitions or on the ballot, and "[f]ailure to make a political designation shall result in the term 'Unenrolled' being used" on the ballot.[4] By additional provisions of the 1979 legislation the word Unenrolled was substituted for Independent at other places in the election statutes.[5]

To turn now to the particular facts, the plaintiff Bachrach before 1979 considered himself a Democrat. When he started his campaign in early 1980, he described himself variously as a Democrat, Independent Democrat, and Independent. But about February, 1980, he left the Democratic party, formally changed his voter enrollment from Demo-

---

[4] The pertinent part of G. L. c. 53, § 8, as amended through St. 1979, c. 745, § 2, is: "All certificates of nomination and nomination papers shall, in addition to the names of the candidates, specify as to each, (1) his residence, with street and number, if any, (2) the office for which he is nominated, and (3) except as otherwise provided in this section and except for city and town elections which are not preceded by primaries or political party caucuses, the political designation, if any, which he represents, expressed in not more than three words; provided, however, that the designation "'Independent'" shall not be used. This information, in addition to the district name or number, if any, shall be specified on the nomination paper before any signature of a purported registered voter is obtained and the circulation of nomination papers without such information is prohibited."

And the amended G. L. c. 54, § 41, is in part: "To the name of each candidate for a state or city office, except for city elections which are not preceded by primaries, shall be added in the same space his party or political designation; provided, however, that the designation shall not include the term 'Independent'. Failure to make a political designation shall result in the term 'Unenrolled' being used." St. 1979, c. 745, § 7.

[5] References to Independent candidates were thus altered at G. L. c. 53, §§ 6, 48, 48A, and 72. (See St. 1979, c. 745, §§ 1, 4, 5, and 6.) Reference to Independent voters at G. L. c. 53, § 38, dealing with change of voters' enrollment, was eliminated by § 3 of the 1979 enactment.

cratic to Unenrolled,[6] and chose not to be a candidate in the Democratic party primary. He felt he did not share the political or ideological views of the incumbent Democratic President, Governor, or State senator for his district. Accordingly, in his campaign literature and public statements he consistently described himself as Independent, the designation which to him best expressed his political views and "direct[ed] voters' attention to a progressive need for competence and effectiveness in government, uninfluenced by party or ideological constraint."[7]

When he forwarded his nomination papers, including certified signatures, to the defendant with a letter dated April 23, 1980, the plaintiff insisted that he be designated Independent on the election ballot. In reply, the defendant called attention to St. 1979, c. 745, and said that the plaintiff was thereby forbidden the designation Independent on his nomination papers and on the ballot, and that Unenrolled would appear as the plaintiff's designation on the ballot if he declined to adopt a designation acceptable under the statute.[8]

It was this response of the defendant that finally provoked the present litigation; and it is necessary to add that the parties in their agreed facts sought to aid the court with certain propositions about political usage or understanding of which we mention the following in paraphrase. Independent had no consistent or uniform meaning except a customary meaning as referring to persons who do not formally affiliate with any political party. Many voters assumed individuals designated Independent had generally

---

[6] See note 5 above as to G. L. c. 53, § 38.

[7] According to the agreed facts, the statements in this paragraph of our text represent the substance of the plaintiff's testimony, were he called by the defendant to testify.

[8] The plaintiff's letter of April 23 forwarded nomination papers in part; the filing was completed later. Several nomination sheets enclosed with the letter carried the designation Independent but (on advice of counsel to preserve rights) most carried no designation, "though, in fact, 'Independent' is my intended designation."

liberal political or ideological beliefs, but many thought such individuals had generally conservative, generally moderate, or generally progressive beliefs. Independent had a generally positive connotation. "Citizens Party," which was to appear as a designation of a candidate on the 1980 ballot, had no consistent or uniform meaning. The designations "Against Politician's Raise" and "The Anderson Coalition," also to appear as designations on that ballot, did not connote associations with established organizations having structures or traditions of political beliefs. The terms Democratic and Republican did connote such associations. Finally (here we draw on the defendant's pleading), as of February, 1980, of the registered voters in the Commonwealth, 45.9% were enrolled in the Democratic party, 14.2% in the Republican party, and 39.9% were Unenrolled.

2. *Discussion.* We state the grounds of our decision which in effect obliged the defendant Secretary to give the plaintiff Bachrach the designation Independent on the 1980 election ballot, despite the contrary provision of the 1979 statute.

(a) *Rights of expression and association; equal protection.* An election ballot is a State-devised form through which candidates and voters are required to express themselves at the climactic moment of choice. See *Anderson* v. *Martin,* 375 U.S. 399, 402 (1964).[9] Whether inscribed on a piece of paper or set out in connection with the levers of a machine, the ballot is necessarily short; it cannot usually permit of discursive statements by candidates, and must call for responses by the electors simple enough to be counted.[10]

---

[9] The First Amendment "has its fullest and most urgent application precisely to the conduct of campaigns for political office." *Buckley* v. *Valeo,* 424 U.S. 1, 15 (1976) (quoting from *Monitor Patriot Co.* v. *Roy,* 401 U.S. 265, 272 [1971]). Expression in the electoral context is "at the heart of the First Amendment's protection." *First Nat'l Bank* v. *Bellotti,* 435 U.S. 765, 776 (1978). The ballot itself partakes of this protection as representing the culmination of the electoral process.

[10] But note the special provisions for informing voters of the substance of referendum measures, as described in *Anderson* v. *Boston,* 376 Mass. 178, 193-195 (1978), appeal dismissed, 439 U.S. 1060 (1979).

Within these natural limitations, a State has discretion in prescribing the particular makeup of the ballot for its various elections (see *Opinion of the Justices,* 368 Mass. 819, 821 [1975]), and in fact the customs and practices as to these arrangements have varied from State to State. Inescapably, however, the discretion must in the end be exercised in subordination to relevant constitutional guaranties. See *Bullock* v. *Carter,* 405 U.S. 134, 140-141 (1972); *Gould* v. *Grubb,* 14 Cal. 3d 661, 669 (1975).

With respect to the political designations of the candidates on nomination papers or on the ballot, it is quite possible that a State could go some distance in washing its hands of the business and leaving it to the educational efforts of the candidates themselves, or their sponsors, during the campaigns. See *Libertarian Party* v. *Eu,* 102 Cal. App. 3d 446, 455 (1980).[11] There is certainly much useful information about parties and candidates that a State is free not to mention or elicit on the ballot, even if physical limitations do not prevent. See *New York State Democratic Party* v. *Lomenzo,* 460 F.2d 250, 251-252 (2d Cir. 1972) (in primary election of delegates to national convention, State need not permit statements on ballot of candidates' presidential preferences). But as soon as the State admits a particular subject to the ballot, and commences to manipulate the content, to legislate what shall and shall not appear, it must take account of the provisions of the Federal and State Constitutions regarding freedom of speech and association, together with the provisions assuring equal protection of the laws. See *Riddell* v. *National Democratic Party,* 508 F.2d 770, 775-779 (5th Cir. 1975). Cf. *Minnesota Fifth Congressional Dist. Independent-Republican Party* v. *State ex rel. Spannaus,* 295 N.W.2d 650, 652-655 (Minn. 1980).[12]

---

[11] In fact candidates for municipal offices in cities which have nonpartisan elections do not present political designations on the ballot. See G. L. c. 50, § 41.

[12] Thus implicated are the First and Fourteenth Amendments to the Constitution of the United States and arts. 1 and 16 of the Massachusetts

In the present case the State did admit subject matter to the ballot and then sought to manipulate it, and the regulation of content that was imposed seems to us repugnant to constitutional principles. We may accept that the candidates of political parties (see n.2) appear on the ballot by their party names, while others, not having an affiliation with such a party, are permitted designations of their choosing of not more than three words.[13] But then the 1979 legislation went on to proscribe the term Independent whether offered as a sole designation or as one of a two- or three-word designation. Nominally the outlawing of the word applied across the board to all candidates. Viewed that way, the prohibition would be unlawful on much the same basis as a statute which might undertake to forbid political candidates in their campaigning to discuss a given subject, e.g., religion or nuclear power (cf. *Consolidated Edison Co.* v. *Public Serv. Comm'n*, 447 U.S. 530, 544 [1980]), or, indeed, to forbid the use during the campaign of some one-word political characterization. See *Cohen* v. *California*, 403 U.S. 15, 22-26 (1971).[14] The constitutional vice was deepened, however, because in practical effect an element

Declaration of Rights.

Article 9, which speaks to the equal right of candidates to be elected, and to equality among voters, is mentioned only incidentally by the plaintiff. *Tsongas* v. *Secretary of the Commonwealth*, 362 Mass. 708, 714 (1972), left open the question whether the art. 9 standard diverges in any way from equal protection. See also *Opinion of the Justices*, 368 Mass. 819, 821 (1975).

[13] We mean to indicate that some differential treatment of candidates of established parties and Independent candidates is to be expected and is reasonable, and to that extent should raise no constitutional difficulties. See *Jenness* v. *Fortson*, 403 U.S. 431, 441-442 (1971). Consider, however, the full discussion by Chief Judge Weinstein in *Greenberg* v. *Bolger*, 497 F. Supp. 756 (E.D.N.Y. 1980), holding invalid postal legislation which provided lower bulk third-class rates for national, State, and congressional committees of the Democratic and Republican parties than for minor parties and independent candidates, and requiring that the same reduced rates be provided for all.

[14] The cited case reversed a criminal conviction that arose from the defendant's applying one scatological word to the military draft. Note the quotation from this case in our text below.

of invidious discrimination was added. Cf. *Anderson* v. *Martin*, 375 U.S. 399, 403-404 (1964).[15] Whereas any other candidate was allowed to use a designation on the ballot conforming to the rubric he used during the campaign, the candidate who chose, quite legitimately, to campaign under the label Independent, was singled out and denied that expression on the ballot. (The coincidence or "intersection" of a violation of First Amendment rights with a breach of equal protection, is very familiar; see *Police Dep't of Chicago* v. *Mosley*, 408 U.S. 92, 94-95 [1972].)[16] The deprivation was not inconsiderable, for Independent is a customary title long availed of in American politics, having a "positive connotation" despite an equivocal meaning, as the agreed facts indicate.

If freedom of expression was impaired, so also would damage be done to associational rights, and thus to the right to vote. For example: Voters who during the campaign might have been favorably impressed with the candidate as an Independent would be confronted on the ballot with a candidate who was called Unenrolled. Unenrolled is hardly a rallying cry: the Commonwealth in its brief appears to grant the possibility that the word would have a negative connotation for voters.[17] Voters, among the many in the Commonwealth considering themselves without party affil-

---

[15] In the cited case the Court struck down a Louisiana statute which required a statement on the ballot of the "race" to which each candidate belonged. Despite the appearance of equal treatment of candidates, the law was held to violate the equal protection clause.

[16] The *Mosley* case, at the suit of a person who was picketing a high school for its alleged racial discrimination, invalidated an ordinance which forbade picketing next to primary or secondary schools, but with an exception for peaceful picketing in connection with a labor dispute. Explaining the "intersection," the Court (408 U.S. at 95 n.3) cited the exemplary discussion by Professor Kalven, The Concept of the Public Forum: Cox v. Louisiana, 1965 Sup. Ct. Rev. 1, 29-30. See also *Carey* v. *Brown*, 447 U.S. 455 (1980); *People Acting Through Community Effort* v. *Doorley*, 468 F.2d 1143 (1st Cir. 1972).

[17] The alternative to Unenrolled for a candidate who preferred to campaign as an Independent would be to adopt unwillingly some other designation which, however, would have to omit the word Independent.

iation, who searched the ballot for a candidate under an Independent banner, would find none, although the fact was otherwise. Ultimately the 1979 regulation might be expected to discourage from the beginning an appeal to voters on grounds of the candidate's independence from established parties and thus to protect those parties from a conventional style of criticism and attack. We agree with the Court in *Cohen* v. *California, supra,* in refusing to "indulge the facile assumption that one can forbid particular words without also running a substantial risk of suppressing ideas in the process. Indeed, governments might soon seize upon the censorship of particular words as a convenient guise for banning the expression of unpopular views." 403 U.S. at 26.

As a substantial restriction of political expression and association, and a discriminatory one at that, the legislation at bar should attract "strict scrutiny" and, in our opinion, must fail such inspection. See *Riddell* v. *National Democratic Party, supra,* 508 F.2d at 776; *Gould* v. *Grubb, supra,* 14 Cal. 3d at 669-671; *Libertarian Party* v. *Eu, supra,* 102 Cal. App. 3d at 454-458, and authorities cited in these cases. Cf. *Massachusetts Pub. Interest Research Group* v. *Secretary of the Commonwealth,* 375 Mass. 85, 95 (1978); *Commonwealth* v. *Dennis,* 368 Mass. 92, 99 (1975).[18] The Commonwealth has argued that this entire analysis is inapposite, citing cases which hold that particular places or occasions are not appropriate for given kinds of communication which accordingly may be excluded: *Lehman* v. *Shaker Heights,* 418 U.S. 298 (1974), is an example, where it was held that the municipality need not open its buses to political advertisements when it had over a

---

[18] We suggested in *Marcoux* v. *Attorney Gen.,* 375 Mass. 63, 65 n. 4 (1978), that "strict scrutiny" and "rational relation" are "a shorthand for referring to the opposite ends of a continuum of constitutional vulnerability determined at every point by the competing values involved." See also *Custody of a Minor (No. 1),* 377 Mass. 876, 884-885 (1979); *Massachusetts Pub. Interest Research Group* v. *Secretary of the Commonwealth,* 375 Mass. 85, 92 n.3 (1978). Here the vulnerability is great. In any event, even if the standard test of "rational relation" is applied, we think the legislation is not supportable.

long period of time allowed only ordinary commercial and
service-oriented advertising there. We think that and
related cases[19] are inapplicable to the voting booth where
political expression in the form of political designations was
allowed on the ballot, save the one particular designation.
Again the Commonwealth has said that the legislation is at
most a regulation of the "time, place, or manner" of expres-
sion like an ordinance that might accommodate the time for
speechmaking in a public place to traffic requirements or
the like. But here the regulation was in terms of the very
content of the communication and so was inherently sus-
pect. See *First Nat'l Bank* v. *Bellotti*, 435 U.S. 765, 785-786
(1978); *Buckley* v. *Valeo*, 424 U.S. 1, 17-18 (1976). Assum-
ing a regulation of content, the Commonwealth still con-
tended that the Legislature might eliminate the one term
Independent from political discourse, at least on the ballot,
on the one hand because it was ambiguous or confusing,[20]
and on the other hand because it had a positive aura and
hence might give a candidate using the designation an
unmerited advantage. It is hard to take the argument
seriously when one looks at the agreed facts and considers
what soubriquets unaffiliated candidates were permitted to
adopt under the statute, apart from the word Independent.
Nor might the Commonwealth take the position that the
legislation was merely underinclusive in its prohibition and
the Legislature was entitled to proceed step by step to elimi-
nate ambiguity: as the Court indicated in *Erznoznik* v.
*Jacksonville*, 422 U.S. 205, 215 (1975), that approach can be
rarely if ever permissible when the basis of regulation is the

---

[19] See, e.g., *Greer* v. *Spock*, 424 U.S. 828 (1976), allowing the military
to close an Army base to political speech, but "no candidate of any politi-
cal stripe had ever been permitted to campaign there." *Id.* at 839. See
Farber, Content Regulation and the First Amendment, 68 Geo. L.J. 727
(1980).

[20] We do not face here a regulation which is intended merely to prevent
confusion of party or candidate names in the trademark sense of "passing
off." See *Foley* v. *Donovan*, 274 Minn. 501 (1966); *Shaw* v. *Johnson*, 311
Minn. 237 (1976).

content of expression. Cf. Black, J., concurring and dissenting in *Cox* v. *Louisiana*, 379 U.S. 559, 575, 580-581 (1965).

(b) *Particular cases.* We have dealt with the present case on the usual basis of principle and analogy, as no decided case has been found "on all fours." Cases of varying pertinence to the present have received attention in the briefs and argument, and we add some remarks to sort them out.

*Tsongas* v. *Secretary of the Commonwealth*, 362 Mass. 708 (1972), considered a claim that a statute giving first place on the ballot in an ordinary partisan election to the incumbent running for reelection (party candidates and other candidates following, respectively, in alphabetical order) was so unequal as to violate art. 9 of our Declaration of Rights (see n.12). The State's interest in some scheme of organization of the ballot contended with a risk of unbalanced treatment of candidates and thus of voters. The case ended inconclusively, as the record, while indicating that first place gave some advantage, had provided no basis for evaluating alternative schemes of placement.[21] The plaintiff had waived any contention based on the fact that the incumbent was designated as such on the ballot. *Clough* v. *Guzzi*, 416 F. Supp. 1057 (D. Mass. 1976) (three-judge court), considered the same ballot arrangement, with the record indicating that the designation of incumbency gave the substantial part of such advantage as there was, first place being a relatively minor factor. Considering the practical effect on the right to vote, and applying, apparently, a "rational relation" test, and noting the possible disadvantages of alternative patterns of placement of candidates on the ballot, the court upheld the statute as a matter of equal protection. There was no discussion of possible First Amendment contentions deriving from the conferral on the incumbent of the right to be designated as such. In all events a statement on the ballot of the indisputable fact of incumbency is far removed in a constitutional sense from

---

[21] The situation had so developed that there was no occasion for remanding the case for further inquiry and findings.

the cloture involved in the case at bar. It is fair to add that the Clough result would probably not be accepted by a number of other courts. See, e.g., *Gould* v. *Grubb, supra,* 14 Cal. 3d 661 (1975) (Tobriner, J.); *McLain* v. *Meier,*     F.2d     (8th Cir. 1980).[a] See also Note, Position of Candidates' Names and Special Designations on Ballots: Equal Protection Problems with the Massachusetts Election Law, 9 Suffolk U.L. Rev. 694 (1975); Mass. Legislative Research Council, Report Relative to Order of Names on the Ballot, 1974 House Doc. No. 5312.

*Riddell* v. *National Democratic Party, supra,* 508 F.2d 770 (5th Cir. 1975) (Tuttle, J.), did go to the First Amendment associational right and has a closer bearing on the instant case. A Mississippi statute provided that no political party should use any name or part thereof which had been previously registered by any other political party. In 1950 the "Democratic Party of the State of Mississippi" was registered. In later years these "regulars" did political battle for leadership of Democratic ranks with "loyalists" banded together as the "Freedom Democratic Party." Considering that for effective competition with the older organization the later one needed the reference to "Democratic" as a designation, the court held that the local statute must fall pro tanto. Rigorous scrutiny was called for and the State could justify the censorship only by showing a compelling interest, and that was not possible; evidently a design to avoid confusion was not enough (indeed the total exclusion of the loyalists from "Democratic" might itself engender confusion). The "confusion" justification is no more plausible in the present case.

Under a California law a candidate of an established party appeared on the ballot with the party name, but any candidate qualifying through a petition process was designated "Independent" without an option to use any other political designation. Thus a designation was forced on a candidate which he might not desire, while in our case a candidate was barred from using a designation that he did desire. The

[a] No. 80-1656 (8th Cir. Oct. 21, 1980, Henley, J.) (digested at 49 U.S.L.W. 2325, Nov. 18, 1980).

Ninth Circuit Court of Appeals sustained the practice, reasoning that Independent in the context of that kind of ballot merely signified the means — petition — by which the candidate got access to the ballot. *Socialist Workers Party* v. *Eu,* 591 F.2d 1252 (9th Cir. 1978), cert. denied, 441 U.S. 946 (1979). When the same problem reached a California State court, it said the opinion of the Federal court was "flawed." It came to a contrary conclusion. It rejected the reading of Independent as merely indicative of the route of arrival at the ballot: on that theory the party candidates should have appeared merely under the caption "Primary" or the like. The statutory scheme invoked strict scrutiny. Its ultimate effect was seen as burdening the associational rights of voters and discouraging the growth of new political organizations. *Libertarian Party* v. *Eu, supra,* 102 Cal. App. 3d 446 (1980) (two to one decision).[22]

In the recent case of *Minnesota Fifth Congressional Dist. Independent-Republican Party* v. *State ex rel. Spannaus, supra,* 295 N.W.2d 650 (Minn. 1980), the court struck down a statute requiring any candidate filing as an Independent for partisan municipal office to make affidavit that he would not seek or accept any party's support for the candidacy. This, under strict scrutiny, was an undue invasion of rights of expression and association with, it seems, a concomitant breach of equal protection, since political parties, in distinction from Independents, were free to seek support in any quarter. The State could take some limited measures to help assure that Independents were such (e.g., to discourage defeated primary candidates from continuing the struggle in another form, see *Opinion of the Justices,* 368 Mass. 819 [1975]), but the condemned statute was not such a measure.[23]

---

[22] Compare *Ihlenfeldt* v. *State Election Bd.,* 425 F. Supp. 1361 (E.D. Wis. 1977) (three-judge court), where candidates of "minority parties or principles" were placed in a column marked Independent but each candidate could identify himself on the ballot in five words or less.

[23] See also *Loza* v. *Panish,* 102 Cal. App. 3d 821 (1980), invalidating a provision allowing the county registrar to reject any 200-word statement by a candidate which contained objectionable words — described as "vulgar," and so forth. The statements by candidates supporting their respective candidacies were intended for circulation by the registrar to the voters in a nonpartisan election.

The foregoing cases seem to us consistent with or supportive of the views we have taken.

(c) *Conclusion.* We suggest that the following quoted remarks may serve as epigraphs for the present case. "The first amendment bars government from censoring pure speech or speakers in order to 'improve the quality' or 'increase the fairness' of public debate."[24] "Constitutional review of election and campaign regulation amounts, in large part, to accommodating the fear of a temporary majority entrenching itself with the necessity of making the election a readable barometer of the electorate's preferences. It is not surprising, therefore, that the vigor of judicial review of election laws has been roughly proportioned to their potential for immunizing the current leadership from successful attack."[25] "In short, I see grave risks in legislation, enacted by incumbents of the major political parties, which distinctly disadvantages minor parties or independent candidates."[26]


BRAUCHER, J. (dissenting). The injunction in this case was issued on short notice, without adequate time for consideration, and on the basis of "agreed facts" of dubious reliability, hastily thrown together by counsel. In a case of first impression, the result was to give constitutional status to the linguistic preferences of the Justices, and to exempt the plaintiff from a rule adopted by the elected representatives of the people. Thus the case stands as an example of premature, unnecessary, and mischievous judicial interference with democratic procedures.

On reflection, moreover, I am convinced that constitutional principles have been misapplied. The court seems to

---

[24] Cox, The Supreme Court 1979 Term — Foreword: Freedom of Expression in the Burger Court, 94 Harv. L. Rev. 1, 67 (1980).

[25] L.H. Tribe, American Constitutional Law 774 (1978).

[26] Burger, C.J., concurring in part and dissenting in part, in *Buckley* v. *Valeo*, 424 U.S. 1, 251 (1976).

recognize that reasonable regulation of the form and content of the ballot is essential to the conduct of an election; there is no need to treat control of misleading ballot designations like censorship of works of art. The Legislature could rationally conclude that "Independent" is an "ambiguous designation." See *Libertarian Party* v. *Eu,* 102 Cal. App. 3d 446, 457 (1980). Cf. *Shaw* v. *Johnson,* 311 Minn. 237, 240 (1976), where, in the absence of statute, the court found no danger of confusion between "independent" and "Independent-Republican." The Legislature could further conclude that use of the label "Independent" tended to foster misrepresentation and, confusion. Remedies to assure that "independent" candidates are "truly independent" have had mixed success. See *Storer* v. *Brown,* 415 U.S. 724, 746 (1974); *Minnesota Fifth Congressional Dist. Independent-Republican Party* v. *State ex rel. Spannaus,* 295 N.W. 2d 650, 653 (Minn. 1980). If the Legislature determined that prohibition of use of the label on the ballot would not impose a serious disadvantage on the candidate, I think it could impose the prohibition. Rational determinations of the Legislature are not to be overthrown merely by findings that they are contrary to fact, much less by "agreed facts" or judicial omniscience. Certainly the fact that candidates were permitted to use imaginative "soubriquets" does not warrant a refusal to take the legislative determination seriously.

The cases cited by the court deal with a variety of subjects: access to the ballot, limitation of campaign expenditures or tactics, a schism in a regular party organization, preferential ballot position, compulsory ballot designations, and others. The present decision involves none of these. It is truly unprecedented.