JAMES J. MCSWEENEY *vs.* CITY OF CAMBRIDGE & others.[1]

Middlesex. January 9, 1996. - May 15, 1996.

Present: LIACOS, C.J., ABRAMS, LYNCH, O'CONNOR, & FRIED, JJ.

*Cambridge. Elections,* Ballot. *Constitutional Law,* Elections, Judicial review.

The record of a proceeding raising for the first time on appeal a challenge to the constitutionality of the Plan E method set forth in G. L. c. 43 as used in Cambridge was insufficient for the court to address the issue. [652-655]

Cambridge's implementation of the method set forth in G. L. c. 54A, § 13, to fill a vacated seat on the Cambridge city council is a reasonable means to achieve the legitimate goal of allowing those who voted for the councillor whose seat is vacated to choose the successor and a party challenging the selection by that means of a person other than himself to fill the vacated seat did not demonstrate any other means to achieve that goal that did not have flaws as great or greater than the means used. [655-658]

CIVIL ACTION commenced in the Superior Court Department on November 18, 1994.

The case was heard by *Wendie I. Gershengorn,* J., on a motion to dismiss.

The Supreme Judicial Court granted an application for direct appellate review.

*Mark T. Collins & Dennis Newman* for the plaintiff.

*Thomas J. Urbelis* for the defendants.

*George I. Goverman* for Fair Ballot Alliance of Massachusetts, Inc., & another, amici curiae, submitted a brief.

FRIED, J. The plaintiff, James J. McSweeney, brought suit in the Superior Court in November, 1994, against the city of Cambridge and its election commissioners (defendants) disputing the method by which a vacancy on the city council of Cambridge had been filled. He asked that either he be

---

[1]The election commissioners of Cambridge and the executive director of the board of election commissioners.

declared elected to the vacant seat, the ballots cast in the November 2, 1993, election be recounted by a different method from the one used to fill the vacancy, or the court order other equitable relief including the holding of a new election. After a hearing, a judge in the Superior Court denied the plaintiff's request for preliminary relief. A single justice of the Appeals Court pursuant to G. L. c. 231, § 118 (1994 ed.), and a single justice of this court pursuant to G. L. c. 211, § 3 (1994 ed.), denied interlocutory review of that judgment. The Superior Court judge then, after argument, granted the defendants' motion to dismiss. The plaintiff appealed. We granted his application for direct appellate review and now affirm.

## I

## A

The city of Cambridge's proportional representation or preferential voting method for electing the members of its city council, authorized as Plan E by G. L. c. 43, § 115, inserted by St. 1938, c. 378, § 15,[2] is unique in the Commonwealth.[3] Indeed, § 115 was repealed by St. 1949, c. 661, § 1, except as it applied to any city then using Plan E. See *Mayor of Gloucester* v. *City Clerk of Gloucester*, 327 Mass. 460, 463 (1951). The option was restored by St. 1954, c. 152, and again repealed by St. 1972, c. 596, § 1. That statute would also have placed on the ballot in Cambridge the question whether Plan E should be continued there, St. 1972, c. 596, § 3, but § 3 was struck down by this court as a

---

[2]General Laws c. 43, § 115, provided: "In any city where elections by proportional representation are to be held, any method of counting the voters' first choices and treating any such choices in excess of the quota [necessary to assure a particular candidate's election], provided for under any system of proportional representation which on January first, nineteen hundred and thirty-eight, was in effect for the purpose of municipal elections in any city of the United States, may be [utilized] . . . ." General Laws c. 54A (especially § 9) set out detailed provisions for the counting of ballots under the scheme. See *Moore* v. *Election Comm'rs of Cambridge*, 309 Mass. 303, 308-310 (1941).

[3]In 1993, a proportional representation scheme existed only in Cambridge for city council and school committee elections and in New York City for community school board elections. See D.J. Amy, Real Choices/New Voices 11 (1993).

violation of art. 89 of the Amendments to the Constitution of the Commonwealth (home rule amendment). See *Belin* v. *Secretary of the Commonwealth*, 362 Mass. 530, 533-535 (1972). Plan E not only contains provisions for the election of the members of the city council and of the school committee by preferential voting, but also prescribes the method for filling vacancies between elections. See G. L. c. 54A, § 13, inserted by St. 1938, c. 341, § 1.[4] Section 13 prescribes that a "vacancy shall be filled for the remainder of the unexpired term by a public recount of the ballots credited at the end of the original count to the candidate elected thereby whose place has become vacant."

In November, 1994, midway between two elections, Councillor William M. Walsh's seat became vacant. Walsh had been in ninth place at the time he was deemed elected to the nine-member city council. McSweeney was the last person eliminated. McSweeney claims that for that reason either he should succeed to Walsh's place, a different method for distributing the ballots should be utilized, or a new election should be held. He claims that the method set out in § 13 violates arts. 1 and 9 of the Massachusetts Declaration of Rights as well as the equal protection clause of the United States Constitution.[5]

This was the only claim that McSweeney made in his complaint and the only issue addressed by the Superior Court judge in her denial of preliminary relief and in her grant of the defendants' motion to dismiss. Although McSweeney's

---

[4]The plaintiff contended below that St. 1972, c. 596, § 1, repealed the method for filling vacancies prescribed in § 13. That claim is without merit. Just as the repeal of preferential voting by the 1972 legislation ran afoul of the home rule amendment to our Constitution in *Belin* v. *Secretary of the Commonwealth*, 362 Mass. 530, 533-535 (1972), so must the subsidiary provision regarding the filling of vacancies under that scheme. McSweeney does not renew that claim here, limiting himself to constitutional objections.

[5]Article 1 of the Massachusetts Declaration of Rights, as amended by art. 106 of the Amendments to the Constitution reads in part: "All people are born free and equal and have certain natural, essential and unalienable rights . . . . Equality under the law shall not be denied or abridged because of sex, race, color, creed or national origin." Article 9 of the Massachusetts Declaration of Rights states: "All elections ought to be free; and all the inhabitants of this Commonwealth, having such qualifications as they shall establish by their frame of government, have an equal right to elect officers, and to be elected, for public employments."

last submission below, his memorandum in opposition to the motion to dismiss, contains some general language regarding the continued validity of *Moore* v. *Election Comm'rs of Cambridge*, 309 Mass. 303 (1941), which upheld the Plan E as a whole against constitutional challenge, he did not directly challenge the system of proportional representation used in Cambridge. Only to this court — in his application for direct appellate review and his brief on the merits — does McSweeney make this more sweeping attack.

### B

The principal feature of Cambridge's preferential or proportional representation method of choosing the nine members of its city council is that the voters designate candidates in order of preference on their ballots, and the ballots cast for candidates who have more than enough votes to be elected or for candidates who have too few votes to be elected are transferred to the candidate next designated in the voter's order of preference. This method, designated as Plan E in G. L. c. 43, stands in contrast to two other methods of electing multi-member councils commonly used in the Commonwealth: a city-wide election in which the voters designate only one name with the candidates receiving the largest number of votes being elected, G. L. c. 43, § 50 (1994 ed.) (Plan A), and the division of the city into wards with the candidate receiving the largest number of votes from the voters in each ward being elected, G. L. c. 43, § 59 (1994 ed.) (Plan B). There are several variations available on each of these methods of selecting the members of multi-member bodies. See, e.g., L. Guinier, The Tyranny of the Majority 14-16 (1994) (cumulative voting used in selection of some corporate boards of directors in which each elector has as many votes as there are places to be filled and may cast one or more of them for the same candidate, the candidates with the largest number of votes being selected); D.J. Amy, Real Choices/New Voices Appendix A (1993) (explaining variations of plurality-majority, proportional representation, and semi-proportional systems). See also Zimmerman, The Federal Voting Rights Act and Alternative Election Systems, 19 Wm. & Mary L. Rev. 621, 640-657 (1978).

An impetus for alternatives to winner-take-all systems is to remove the perceived unfairness of having the preferences of

those voting for the nonplurality candidates totally ignored. This is sometimes referred to as the problem of the "wasted" ballot, and the identification of this problem as a defect in eliciting the wishes of the voters goes back at least to 1861 and John Stuart Mill's Considerations on Representative Government.

As we understand him, McSweeney is not complaining that Plan E is unconstitutional in that it departs from the winner-take-all methods of Plans A and B, but rather his complaint is against the implementation of the preferential system in Cambridge. He makes two specific claims: first, the selection of ballots from among those that designate as their first choice a candidate who reaches quota[6] during the initial count, for transfer to their second subsequent preferences, means that only some voters are given a chance to have their subsequent preferences counted; second, that, as he claims occurred in the November, 1993, election, "approximately ten percent of all ballots are likely to be discarded and therefore not counted at all." As to the first claim, it would be misleading to say that some ballots are counted two or more times. Although these ballots are examined two or more times, no ballot can help elect more than one candidate. We suppose that by the second claim McSweeney is referring to those ballots that were "exhausted."[7] It is not correct to say that those ballots are "not counted at all." They too are read and counted; they just do not count toward the election of any of the nine successful candidates. Therefore it is no more accurate to say that these ballots are not counted than to say that the ballots designating a losing candidate in a two-person, winner-take-all race are not counted.

As we have said, McSweeney did not raise this claim in his complaint in the Superior Court, and the judge below did not

[6]"[Q]uota" is defined in § 9 (*c*) of G. L. c. 54A, inserted by St. 1938, c. 341, § 1, as "the smallest number of votes which any candidate must receive in order to be assured of election without more candidates being elected than there are offices to be filled. It shall be determined by dividing the total number of valid ballots by one more than the total number of candidates to be elected, and adding one to the result, disregarding fractions."

[7]A detailed description of the process is required to explain which ballots ended up in the exhausted pile at the conclusion of the election. For our purposes, it is sufficient to say that the exhausted pile consisted of all the ballots not in the pile of one of the elected councillors.

address it. It is our usual, though not invariant practice, to
decline to consider claims raised for the first time on appeal.
See *Boston Gas Co.* v. *Somerville*, 420 Mass. 702, 703 n.2
(1995); *Milton* v. *Civil Service Comm'n*, 365 Mass. 368, 379
(1974). Nevertheless, for two reasons we make some com-
ment on McSweeney's opening claim that the city's method
for choosing councillors in the general election violates the
Federal Constitution and the Massachusetts Declaration of
Rights: first, because the method by which the vacant seat is
filled, the issue litigated below, builds on the distinctive
method by which the seats in the general election are filled[8];
and second, because we deem it imprudent to leave an issue
of such importance to the people of Cambridge under a
greater cloud of uncertainty than is necessary. Cf. *Com-
monwealth* v. *Alvarez*, 413 Mass. 224, 233 (1992) (court
considers issue not raised below "because it involves a
fundamental right, has been fully briefed, and is certain to be
raised in other cases").

McSweeney insists that the city may no longer rely on our
very thorough consideration of Plan E in *Moore, supra,* since
that decision stated that Plan E "cannot be struck down as
unconstitutional because unreasonable, unless it cannot be
supported on any rational ground." *Id.* at 322. See *id.* at 331.
McSweeney is quite correct that in the intervening years both
this court and the Supreme Court of the United States have
made clear that voting rights are fundamental and that
derogations from those rights are subject to strict, not rational
basis scrutiny. *Kramer* v. *Union Free Sch. Dist. No. 15*, 395
U.S. 621, 628 (1969) ("need for exacting judicial scrutiny of
statutes distributing the franchise"); *Bachrach* v. *Secretary of
the Commonwealth*, 382 Mass. 268, 276 (1981). The city's
reliance on *Moore* for the proposition that "the issue of the
constitutionality of Cambridge's system was resolved fifty-
four (54) years ago" is obviously inadequate, and neither the
city's citation of two footnotes in a concurring opinion in a
Supreme Court decision deciding another issue, (*Holder* v.
*Hall*, 114 S. Ct. 2581, 2600 n.16, 2601 n.17 [1994] [Thomas,
J., concurring]), nor a string cite of cases decided by this

[8]McSweeney makes this point when he argues that the vacancy filling
mechanism must pass strict, not merely rational basis, review, because
"[b]y returning to the underlying election, the Cambridge recount scheme[ ]
triggers a heightened level of scrutiny."

court addressing other matters, is persuasive on this issue.
For his part, McSweeney does little more than point to the
features of Plan E as examples of how Plan E derogates from
the equal right to vote. The simple description of those
features hardly shows that Plan E derogates from the
fundamental right to vote or denies each citizen the right to
have his or her vote counted equally. Indeed, as the court
pointed out in *Moore, supra,* a preferential scheme, far from
seeking to infringe on each citizen's equal franchise, *id.* at
324, seeks more accurately to reflect voter sentiment and "to
provide for the representation of minority groups in the mu-
nicipal council or to enlarge the possibility of a voter's being
represented therein by giving [the voter] an opportunity to
express more than one preference among candidates." *Id.* at
331. This purpose is not a derogation from the principle of
equality but an attempt to reflect it with more exquisite ac-
curacy. Nonetheless, perhaps a showing can be made that in
the actual operation of the scheme some inequalities come in,
that they are substantial enough to raise constitutional doubts,
and that the scheme cannot be more narrowly tailored to ac-
commodate the plainly compelling interest to represent ac-
curately the wishes of all the voters.[9]

We have no such case before us. Indeed we do not even
have definitive findings as to how Plan E is implemented in
one of its crucial details. General Laws c. 54A, § 9 (*e*),
provides that, when a candidate has reached quota "while the
ballots are being sorted according to first choices, any
subsequent ballots which show him as first choice shall be
credited to the second choice marked on it." Which ballots of
such a successful candidate are transferred will depend on the
order in which the ballots are counted, and thus, as was
pointed out in *Moore, supra* at 332, the "results may be af-
fected, to some extent, by the order in which the ballots are
counted, and this order depends in some degree on the ele-
ment of chance." But it may well be that this is not exactly
how the count actually proceeds. The record contains a docu-

---

[9]It is a difficulty that the system is so complicated that few voters
participating in it are likely to understand it fully. But we are pointed to no
constitutional protection that this difficulty violates. Cf. D.J. Amy, Real
Choices/Real Voices 155-156 (1993) (arguing that voters do not need to
understand the complexities of preferential voting for the system to work
effectively).

ment entitled A Manual for Conducting the Plan E Count prepared by the election commissioners of Cambridge and dated 1991. This manual provides that all the ballots for an elected candidate be gathered together, the number in excess of quota determined, and then that number withdrawn and transferred by selecting, for example, every fifth ballot if the candidate is twenty per cent in excess of quota. Thus, a more perfectly random selection of ballots for transfer is effected. It is to this system that McSweeney makes reference in his brief, but of course we have no finding or even a statement of agreed facts to its actual workings. In short, we cannot and should not go further in considering this issue. See *Tsongas* v. *Secretary of the Commonwealth*, 362 Mass. 708, 714-715 (1972) (declining to decide issues on an incomplete record).

## II

This leaves the only question decided by the Superior Court judge: the validity of the method employed to fill the Walsh vacancy. McSweeney claims that as the recipient of the tenth largest number of initial and transferred votes (he was just behind Walsh — by forty-seven votes), he should either succeed to Walsh's seat, or, in the alternative, the ballots should be recounted pursuant to a different scheme, or a new election held. Plan E, however, prescribes none of these alternatives. See G. L. c. 54A, § 13. Section 13 in effect requires the recount of only the ballots credited to the candidate whose vacancy is being filled. If no candidate receives a majority of these ballots, then the ballots of the candidate lowest in the poll are transferred according to their next preference, and the process is repeated until one candidate receives a majority of the ballots. This scheme selected not McSweeney but the candidate who stood twelfth in the 1993 election.

McSweeney argues that by counting only the Walsh ballots and not the exhausted ballots, § 13 introduces an element of inequality among voters that cannot survive strict scrutiny. The premise of this argument, that strict scrutiny applies here, is wrong. Any method for filling a vacancy will to some extent be unsatisfactory for the simple reason that it is not possible to go back in time and discern with confidence what would have happened if the voters had made their choices without the presence of the later vacating councillor. Even a special election may be said to disenfranchise the prior voters

to some extent in favor of those voting in the later one. That is why the Supreme Court of the United States has declined to demand the impossible and has applied a more relaxed standard in reviewing mechanisms for filling vacancies. In *Rodriguez* v. *Popular Democratic Party*, 457 U.S. 1 (1982), the Supreme Court accepted as constitutionally permissible a scheme whereby vacancies in the Legislature of the Commonwealth of Puerto Rico are filled on the recommendation of the political party of the legislator whose seat has become vacant. Considering this as an example of the system of filling vacancies by appointment rather by special election, the Court stated that "[t]he Constitution does not preclude this practical and widely accepted means of addressing an infrequent problem." *Id.* at 12. The Court made clear that it was applying a standard of reasonableness by its endorsement of a statement by the three-judge court in *Valenti* v. *Rockefeller*, 292 F. Supp. 851 (S.D.N.Y. 1968), aff'd, 393 U.S. 405 (1969), that "[i]n this case we are confronted with no fundamental imperfection in the functioning of democracy. . . . We have, rather, only the unusual, temporary, and unfortunate combination of a tragic event [the assassination of Senator Robert F. Kennedy] and a reasonable statutory scheme." *Rodriguez, supra* at 11, quoting *Valenti, supra* at 867. These considerations have equal force under our own Declaration of Rights. Insofar as the issue relates to each voter's right to an equal voice in the electoral process, a scheme for filling vacancies need only meet rational basis review.[10] Looking to the voters of the vacating councillor to determine who shall be the successor, while not the only reasonable goal, is surely as reasonable as the scheme endorsed in *Rodriguez, supra.*

The next step in our inquiry is to ask whether the means chosen are rationally related to the legitimate goal of allowing those who voted for the councillor whose seat is vacated to choose the successor. See *Marshfield Family Skateland, Inc.* v. *Marshfield*, 389 Mass. 436, 445-446, appeal dismissed, 464 U.S. 987 (1983) (" 'if the means the State adopted are rationally related to the achievement of that purpose, the legislation will withstand constitutional challenge' [footnotes

---

[10]We put the matter in this way to make clear that this permissive standard would not be applicable to judge a complaint that a scheme intentionally discriminated against a racial or ethnic minority or violated some other constitutional precept.

omitted]. *Shell Oil Co.* v. *Revere*, 383 Mass. 682, 686 [1981]"). Under the rational basis test, McSweeney "has an onerous burden of proof in establishing the invalidity of the statute." *Commonwealth* v. *Henry's Drywall Co.*, 366 Mass. 539, 541 (1974). McSweeney complains that, among other things, § 13 may systematically disadvantage the last candidate to be eliminated in the general election vis-à-vis those eliminated earlier. Where the ballots of the lower-ranking candidates had the opportunity in the general election to be distributed to one of the elected candidates, the tenth-ranking candidate's ballots are not completely redistributed once nine candidates are deemed elected, thereby denying the tenth-ranking candidate's ballots the opportunity to end up in the pile of an elected councillor and be recounted if that elected councillor's seat becomes vacant. As the helpful brief of amici Fair Ballot Alliance of Massachusetts, Inc., and Center for Voting and Democracy, Inc., explains it:

> "A candidate surviving late in X's [the candidate whose seat becomes vacant] climb to quota (i.e., a more successful candidate, A), will be worse off than one eliminated early (a less successful candidate, B). The ballots of B, the less successful candidate, will be more likely to end up in X's pile to be re-distributed back to B on the vacancy re-distribution, whereas A's ballots may remain with A until after X reaches quota, in which case, A's ballots will not go to X and never get in X's pile for later vacancy re-distribution back to A. Thus A can do better than B in the election, and thereby do worse in the vacancy re-fill."

McSweeney suggests that a proper recount would include the recount of all the exhausted ballots and the Walsh ballots. But this suggestion contradicts what we determine to be a reasonable goal: to have those who elected Walsh determine who should fill his seat.[11] McSweeney's proposal that the last to be eliminated be awarded the vacant seat is inappropriate

---

[11]The amicus brief states of another vacancy filling system, one which would eliminate the anomaly just identified by analyzing the ballots of all losing candidates to determine the choice most compatible with the candidate whose seat is vacated, that: "[t]he formula for this analysis has yet to be devised." McSweeney does not suggest a formula for such a procedure.

for the same reason. In short, McSweeney misses the fact that the difficulty here is not with the goal of § 13 but with its implementation, and McSweeney has not presented the court with a method of achieving this reasonable goal that does not have flaws as great or greater than the method that was used.

We have so far ignored the fact that this second of Mc-Sweeney's claims, the only one considered by the Superior Court, is now moot, since a new general election was held in November, 1995, making the filling of the vacancy irrelevant. We do, however, in our discretion consider an issue that has become moot in a particular case if it is "capable of repetition, yet evading review." See, e.g., *Superintendent of Worcester State Hosp.* v. *Hagberg,* 374 Mass. 271, 274 (1978). Due to the delays of litigation, a dispute about filling a vacancy in the city council, if it does not arise early in the two-year election cycle, may indeed avoid definitive review. Given the scant help we have received from the parties, however, we have gone as far as we can and conclude that on this showing § 13 is a reasonable means for achieving a legitimate governmental goal and thus that it survives rational basis review. Perhaps in some later adjudication it may be shown that another method of filling a vacancy is so clearly preferable in achieving the goal of having the voters for the vacating councillor determine the successor that it is irrational not to use it. We would not foreclose that possibility. For the time being, however, § 13 remains intact.

The judgment of the Superior Court is affirmed.

*So ordered.*